THE MARMOR.

THE SOCONY NO. 19.

THE SOCONY NO. 20.

THE ROBERT H., Inc.

No. A–17686.

District Court, E. D. New York.

Oct. 29, 1946.

Purdy & Lamb, of New York City (Edward F. Lamb, of Buffalo, of counsel), for libellant.

John W. Knox, of New York City, for respondents.

GALSTON, District Judge.

On June 16, 1945, a collision occurred in Newtown Creek between the tug Marmor and the Socony Barge No. 88.

Early that morning, the Marmor tow, with the light oil barge Telco on the tug's starboard side, proceeded outbound through Newtown Creek. The barge was made fast in the usual fashion with head line, towing strap and stern line; the stern of the tug projected somewhat aft of the barge, and about 68 feet of the barge extended ahead of the tug. This tow approached the Greenpoint Avenue bridge across Newtown Creek and passed under it. At about that time the loaded barge Socony No. 88, in tow of the tug Socony No. 19, made fast to the tug's port quarter, and with another Socony tug, No. 20, made fast astern, was bound in the opposite direction through Newtown Creek. Despite the maneuvering of the two tows and the exchange of signals, a collision occurred between the port side forward of amidships of the tug Marmor and the port bow of the Barge No. 88, at an angle of about 30 degrees.

Despite a very considerable contradiction in testimony given by witnesses for the respective parties, I find that this collision resulted from faults in navigation committed by both flotillas. As the Marmor proceeded with her barge through the draw of the bridge, the Socony No. 19 sounded a one whistle signal to indicate that the Marmor should go ahead and effect a port to port passing. The Marmor answered with a one blast signal, thus signifying its willingness to pass port to port. But the Marmor on continuing ahead, about in the middle of the channel and if anything somewhat on her port side of the channel, had the bow of the Telco heading off to the right and her stern swinging to the left, and thus was to that extent prevented from effecting a port to port passage. The mate in charge of the Marmor admitted that instead of going on straight ahead he was at an angle to the shore.

A disinterested witness, Captain Gritmon of the tug St. Joseph, testified that after the Marmor passed under the bridge she was bearing on her port side of the channel; that she sheered to the right and stopped her engine while heading toward but not yet on the Long Island City side of the docks, and so drifted down on her port side until she almost reached the Socony No. 88. According to Gritmon, the Marmor then reversed her engine, the effect of which was to pull her bow to port and against the port bow of the Socony barge.

On the other hand it seems reasonably clear that the Socony tug was not free from fault. The superstructure on the barge No. 88 was an obstacle to unimpeded vision in all directions of the captain of the Socony No. 19. The deckhand stationed at the bow of the No. 88 saw the Marmor and her tow coming through the bridge. His warning to the captain of the tug was not given until the Marmor tow was 50 feet away. So it would seem that Nolan watched the drift of the Marmor while that tow proceeded or drifted at least 300 feet before giving any warning to the master of the Socony No. 19. It is claimed by the Socony witnesses that the Socony barge was lying dead in the water at about 450 to 500 feet from the bridge, the tug No. 19 having stopped her engines.

The impelling fact concerning the Socony navigation is that the vision of the captains of the tugs No. 19 and No. 20 was practically obscured up to the instant of contact. The captain of the tug No. 19 testified on cross-examination that the Telco No. 8 had been entirely out of his vision for "approximately a couple of minutes" before the mate called out to him to reverse his engines. Furthermore, during that same time the captain of the No. 19 did not see the tug Marmor. The maneuvers of the approaching Marmor tow should

356

have been described by the mate or lookout on the No. 88 at some considerable time before the collision. Unfortunately a timely warning was not given. Then too, if as Captain Bush testified the engines of the tug No. 19 were stopped at a distance of 1000 feet from the bridge, and the flotilla thereafter drifted to a point about 400 feet above the bridge, it must be recognized that the Socony No. 19 had to come around a bend in the channel with a heavily laden barge 260 feet in length and drawing 21.5 feet aft and 19.8 feet forward, in a channel in which the depth of water at mean low tide was in places no more than the maximum draft of the barge. In such circumstances there would be a tendency, as the libellant, it seems to me, correctly argues, for the barge to continue on the heading which she had at the time that the engines of the No. 19 were stopped. This circumstance too must be considered in connection with the blocking out of the vision of the captain of the No. 19, and helps explain how the Marmor tow would be out of view after the Marmor had turned to the right above the bridge.

The libellant may have a decree for half damages.

Concurrently with this opinion, appropriate findings of fact and conclusions of law will be filed.